# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| **United States of America,** | |
| **v.** | Case No. 4:24-CR-00057-001 |
| **Tyler Loudon,** | |
| **Defendant.** | |

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

Tyler Loudon, by and through the undersigned counsel, respectfully submits this memorandum in aid of sentencing and, for the reasons detailed below, requests a below-guidelines sentence of one-year home confinement, to be followed by two years of supervised release, based on a downward departure and/or variance warranted in this case.

## I.   INTRODUCTION

Mr. Loudon stands before the Court after having pled guilty to criminal information and admitted that he used material, non-public information he obtained from his former wife to execute stock trades. Mr. Loudon takes full responsibility for his conduct. He knows that he alone is to blame for the position he now finds himself. As a result of his choices, Mr. Loudon is now a convicted felon, his wife has divorced him, he was fired from his job, and he is facing the prospect of prison. As a result of this conviction, Mr. Loudon's has little realistic hope for future employment in his field of engineering, and his future job prospects are extremely bleak. Regardless of the sentence the Court imposes, Mr. Loudon will be paying the price for his colossally bad judgment for the rest of his life.

## II.   BACKGROUND

Mr. Loudon grew up as an only child in Napa, California. His nuclear family was not only small, but so was his extended family – his mother was an only child, and his father had but one sibling. He rarely saw either set of grandparents. Mr. Loudon's father ran a pizza shop in Fairfield, Ca., where Mr. Loudon would work after school.

Mr. Loudon's parents divorced when he was 11 years old, an event that was deeply traumatic for him. He subsequently learned that his father had been having extramarital affairs involving prostitutes since Mr. Loudon was only two years old. Before his parents finally divorced, there were frequent and serious arguments that Mr. Loudon was forced to witness.

In addition to hiring prostitutes, his father also engaged in illegal drug use. At one point, Mr. Loudon's father was robbed of the receipts from the family's pizza shop by prostitutes and his mother was unable to pay for groceries for the week. After his parents divorced, Mr. Loudon's mother was forced to obtain a restraining order against her husband due to his illegal drug use, and her husband was only permitted weekly, supervised visits with his son. All of this was devastating for a child who had, at one point, idolized his father.

Mr. Loudon had a strong aptitude for mathematics and the sciences, and he attended California Polytechnical University (Cal Poly) where he studied mechanical engineering. Although Mr. Loudon had saved some money to pay for college and was helped by a small amount of money given to him by his grandparents, it was a great struggle to pay for school. Mr. Loudon realized that it would be difficult to finance four years of college, so he loaded up as many credits as possible every quarter, and then worked multiple jobs and lived at home during a co-op student employment – even though that entailed a 90 minute commute to work     – in order to save on housing costs. As a result of his intense efforts, Mr. Loudon graduated in under four years, whereas the average time required for his major was 5.6 years at the time.

### III.   EMPLOYMENT

Mr. Loudon's first job out of college was as a manager at Anheuser-Busch in 2004. A few years later, Mr. Tyler determined that an MBA would help him advance in his field, so he pursued that as well, and obtained this degree from Pepperdine University in 2009. After obtaining his MBA, Mr. Loudon continued working as an engineer and, in 2011, took his first job in the energy industry when he was hired by an oil and gas company in Bakersfield, California. Eventually, Mr. Loudon relocated with the job to Houston in 2012, where he became a Product Manager. That same year, Mr. Loudon met his now former wife, Emily Kraus, at a

2

party. They dated for three years and married in 2015. Mr. Loudon and Ms. Kraus lived in Bakersfield from 2018 to 2021, when they decided to relocate to Houston.

In 2023, Mr. Loudon's 77 year-old mother was diagnosed with dementia and early onset Alzheimer's disease. At the time of this diagnosis, she was living with an alcoholic ex-boyfriend who would not leave her home and was taking advantage of her residence. Because his mother was herself an only child with no siblings and no husband, the responsibility for his mother fell entirely on the shoulders of Mr. Loudon, as the only child. It is Mr. Loudon's responsibility to assist his mother in all aspects of her life, such as managing her finances and paying her bills, taxes, and other living expenses. He is also responsible for the maintenance of her home and has hired contractors to make the necessary repairs to a home his mother has lived in for nearly 50 years. Mr. Tyler has also made the necessary arrangements for his mother to be brought to an adult daycare program every week and calls his mother to remind her of this and her other appointments. Mr. Loudon has also hired a caretaker to go to his mother's home every day to make sure she is eating, showering, dressing herself properly, and getting some form of exercise.

Mr. Tyler also regularly communicates with his mother's neighbors to make sure they are checking in on her and confirming that she is well. He has also coordinated with county support services and social workers to assist him in having a verbally abusive, alcoholic ex-boyfriend who was taking advantage of his mother removed from her home and made sure local law enforcement was aware of this situation.

Mr. Loudon is the point person for all of his mother's care. He is consumed with fear that no one will be able look after her needs if he is incarcerated for an extended period of time.

IV.    **THE OFFENSE CONDUCT**

At the time of this offense, Mr. Loudon was a frequent day-trader of stocks and securities. He was in charge of the family's finances and spent much of his free time reading financial news in order to discern market trends and potential investments. In early 2022, Mr. Loudon became aware that his wife, who worked as a mergers and acquisitions manager at BP, was working on a potential acquisition of a publicly traded company. Mr. Loudon learned this information through casual conversations with his wife, as well as overhearing her telephone conversations while they were both working from home. During the Spring of 2022, these acquisition discussions faded away, but they picked up again late in the year. The acquisition was publicly announced in mid-February 2023.

During this time period, Mr. Loudon's marriage was under a great deal of stress as a result of multiple relocations and job changes for both Mr. Loudon and Ms. Kraus. Mr. Loudon began to fear that his marriage was in jeopardy, an event that was particularly freighted in his mind due to the divorce he experienced as a child. In a wholly misguided belief that money could somehow help address the marital stresses the couple was experiencing, Mr. Loudon made the fateful decision to betray his wife's trust, as well as his own better judgment.

Several months before the public announcement of the acquisition, Mr. Loudon began to buy stock of the target company. For a period of seven weeks, Mr. Loudon sold his other holdings and bought approximately $2.0 million of the target company. After the acquisition was announced, the stock price rose and Mr. Loudon sold all of his shares, netting a profit of $1.76 million.[1]

---

[1] Mr. Loudon has forfeited the $1.76M he obtained pursuant to these trades to the government. *See* Satisfaction of Money J. 1, ECF No. 18.

Mr. Loudon makes no attempt to justify his decision to trade on confidential information. He succumbed to temptation and made an egregious, life-altering decision to try and make money. Within weeks of selling this stock, Mr. Loudon realized that his conduct would be discovered when he learned from his wife that BP was conducting a routine review of stock trades made by BP employees and their close contacts. Within a few days of this conversation, Mr. Loudon, racked with guilt and fear, confessed to his wife that he had breached her trust and traded in the company acquired by BP. Mr. Loudon's wife immediately reported to her superiors at BP what had happened and, as a result, lost her job.[2] She then moved out of the marital home and, shortly thereafter, commenced divorce proceedings against Mr. Loudon. That divorce became final late last year. After news of Mr. Loudon's plea became public, he was terminated from his job. Mr. Loudon is currently unemployed.

## V.     THE GUIDELINES ARE ADVISORY, AND THE SENTENCE SHOULD BE NO GREATER THAN NECESSARY TO SATISFY THE STATUTORY PURPOSES UNDER § 3553(a)

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable[.]" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*,

---

[2] Ms. Kraus has, fortunately, been able to obtain new employment in her same field.

5

440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G § 5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range, the Court must engage in the second step of considering the 18 U.S.C. § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338. Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge[.]" *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any 18 U.S.C. § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 89, 111 (2007).

A.     A non-custodial sentence is appropriate and consistent with how similar cases have
       been handled and in light of Mr. Loudon's personal history and characteristics (§
       3553(a)(1))

      **1.     Insider trading cases involving spouses and no further tipping are
       frequently not charged criminally.**

One of the central goals of the Sentencing Guidelines is that similar cases are handled

similarly throughout the country. In analyzing similar cases involving individuals who

misappropriate and then trade on confidential information taken from a spouse, a sentence of

probation or home-confinement would be a disposition in the heartland of typical dispositions.

Indeed, civil, non-criminal dispositions are the typical fashion in which these types of cases are

handled. For example:

- ***SEC v. Hanold***, No. 11-cv- 07148 (N.D. Ill. Oct. 11, 2011): Wife was an executive at
  Aon Corporation, Inc. who told her husband about an imminent merger agreement
  between Aon and Hewitt Associates. Minutes after the call, wife e-mailed her husband
  twice in which she asked him not to share the information, specifically, "Pl. (sic) don't
  send any emails about what I just told you." and "To anyone you work included (sic)."
  Husband responded, "I won't, no need. I only wish we had bought their stock!!!"

  The next day husband purchased 831 shares of Hewitt Associates' stock and then sold the
  Hewitt Associates' stock shortly after public announcement of merger.

  Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment
  interest.

- ***SEC v. Chen***, No. 5:14-cv-01467 (N.D. Ca. Mar. 31, 2014) Wife was a senior tax
  director at Informatica Corporation and had previously told her husband that he was not
  to trade in Informatica securities under any circumstances and believed husband
  understood her concerns. While on vacation, the husband overheard his wife's business
  phone calls and observed her unusual work schedule and suspected that Informatic may
  miss its revenue and established securities positions designed to make money if
  Informatica's stock price fell. The Husband sold Informatica short, sold call option
  contracts, and bought put option contracts, using four different family brokerage
  accounts. Informatica's shares declined more than 27% after it announced the earnings
  miss.

  Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment
  interest.

- ***SEC v. Hawk***, No. 5:14-cv-01466 (N.D. Ca. Mar. 31, 2014): Wife was finance manager
  at Oracle Corp. and periodically worked from home. Her husband overhead the wife's
  work calls regarding Orcale's acquisition of Acme Packet Inc. Even though the wife
  informed husband that there was a blackout window during the next three weeks for

trading Oracle securities because Oracle was in the process of acquiring another company, her husband purchased ~$669,000 worth of Acme Packet shares (28,000 Acme Packet shares) before the acquisition announcement. The husband then sold all 28,000 shares the day after the acquisition was publicly announced.

Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment interest

- **SEC v. Abdelkader**, No. 3:23-cv-01032 (N.D. Cal Mar. 09, 2023): Wife worked for Audentes Therapeutics, Inc. Husband learned from Wife that there was a high likelihood of Audentes being acquired by subsidiary of Asetllas Pharma, Inc. Husband checked the prices of Audentes call option contracts and a couple days later husband purchased 50 call option contracts. Husband sold call options days after Audentes's public announcement of the acquisition agreement.

Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment interest.

- **SECv. Hengen**, No. 18-cv-003135 (D. Minn. Feb. 08, 2019): Wife was vice president of human capital at a UnitedHealth Group, Inc. and typically worked from home at least once a week and frequently set up a workstation at the dining room table. Her husband overheard her work phone calls, specifically the words "USMD" and "Dr. House". The husband searched the internet and learned USMD was a healthcare company in Texas and Dr. John House was Chairman and CEO at USMD, and then deduced that UnitedHealth was in negotiations to acquire USMD. The husband then purchased more than 8,000 shares of USMD stock over 2 months. While purchasing USMD stock, husband tried to get updated information about the status of the USMD acquisition from his wife. The husband also tipped his brother and three coworkers, who collectively purchased ~3,300 shares. The day after the public announcement of agreement, husband sold 5,500 shares, as did his coworkers and brother.

Months later, the husband learned of UnitedHealth's negotiations to acquire Surgical care by opening his wife's notebook and seeing references to Surgical Care Affiliates when she was working from home. Husband purchased 3,160 shares of Surgical Care stock which he sold the day after UnitedHealth and Surgical Care announced their agreement.

Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment interest.

- **SEC v. Grewal**, No. 8:14-cv-02026 (C.D. Cal. Jan. 19, 2015): Husband served as outside counsel to Spectrum Pharmaceutical and learned Spectrum was on the brink of announcing a significant decline in expected revenue due to an unanticipated drop in orders for its top selling drug. Within 48 hours husband sold entire investment (8,000 shares) in Spectrum stock. A few days later, the husband tipped his wife and she, too, sold all of her Spectrum shares. After the couple sold their shares, Spectrum issued a press release announcing expectation of decreased sales of Fusilev (the drug) and consequent expectation of reduced revenue; Spectrum's stock price fell more than 35%.

Disposition: Civil resolution only; disgorgement of profit, penalty, and prejudgment interest

- ***SEC v. Calice****, et. al., No. 1:21-cv-05009 (S.D.N.Y. June 9, 2021)* Holly Hand worked as a senior clinical trial project manager at Neuralstem, Inc. Hand lived with Chad Calice and the couple jointly owned their home, shared a mortgage, and had a joint bank account. Hand learned that a clinical trial had negative efficacy results and disclosed the negative clinical trial outcome and her concerns about its potential adverse impact on the company's business prospects and her own employment status to Calice. Days later, Calice and Hand were in frequent communication about Neuralstem's stock price. Calice placed his first sell order and sold the remainder of his Neuralstem position during the day. Calice then tipped off his uncle, who sold his entire Neuralstem position.

  Disposition: Civil resolution only; disgorgement of profit, penalty ~2x amount of profit, and prejudgment interest.

- ***SEC v. Marovitz****, No. 1:11-cv-05259 (N.D. Ill. Aug. 03, 2011)* Wife (Christina Hefner) was Chief Executive Officer at Playboy Magazine. Ms. Hefner asked Playboy's general counsel to warn her husband about the implications of any stock trading by her husband in Playboy stock. The general counsel faxed a memorandum to husband's home and office warning of the "serious implications" of trading in Playboy stock, including that the SEC's rules governing Ms. Hefner's sale or purchase of stock are equally applicable to him, particularly the rules governing insider trading and that his purchases are imputed to his wife. Although the general counsel requested that the husband consult with him before executing any trades in Playboy stock, the husband never did this and, instead, repeatedly traded on confidential information on five occasions between 2004 and 2009. On each occasion, the husband used confidential information he learned from his wife to avoid potential stock losses or to maximize his gains when there was news that would increase the stock price.

– Disposition: Civil resolution only; disgorgement of profit, penalty ~1/3 profit, and prejudgment interest.

In all of these cases involving insider trading among spouses – all of which resulted in a civil disposition with no criminal prosecution – there were aggravating facts not present in Mr. Loudon's case. For example, unlike *Marovitz,* here there were no warnings or cautions from in-house counsel advising the trading spouse about the legal liabilities of trading on confidential information. Nor was there the use of sophisticated trading positions, such as selling short, selling call options, or buying put option contracts as in *Chen,* or purchasing call option contracts, such as in *Abdelkader*. Nor were their e-mails from Ms. Kraus reminding Mr. Loudon not to share the information, as there were in *Hanold*. Nor did Mr. Loudon attempt to hide his conduct through the use of different brokerage accounts in order to conceal his identity, as in

*Chen.* Nor did Mr. Loudon, like the traders in *Hengen* and *Calice,* tip others so that they, too, could also trade. Nor did Mr. Loudon engage in pro-active, "surreptitious" conduct to obtain information, such as Googling words overheard on his wife's work phone calls, or prod his wife for additional information, or secretly review her laptop, such as the trader in *Hengen*.

Most, if not all, insider-trading cases involving spouses that have resulted in criminal prosecutions typically have involved aggravating facts not present here. For example:

- ***United States v. Kanodia***, 943 F.3d 499 (1st Cir. 2019): Wife, who worked as chief legal officer/general counsel for Apollo Tyres, Ltd. Apollo, discussed in her husband's presence the fact that Apollo was to acquire Cooper Tires, a public company. The husband told two friends about the acquisition and said that he could not trade because it would set off a red flag, so he wanted the friends to trade for him and give him a percentage of their profit. The husband instructed his friends to buy as much stock as they could and he kept them updated on the deal's progress, including the agreed-upon purchase price for Cooper Tire. The husbands' friends accumulated Cooper Tire shares and call options until public announcement of merger and then sold their interests. As a result, the friends collectively garnered $1.3 million in proceeds and the husband received $240k as a kickback. To conceal the kickbacks from his wife, the husband opened a new bank account, into which the kickbacks were deposited.

- ***United States v. Altvater***, No. 1:17-cr-10216 (D. Mass.): Wife worked for Ariad Pharmaceuticals as head of pharmacovigilance and risk management. Her husband learned from her about Ariad's drug, including its performance in various clinical trials and Ariad's negotiations with the FDA concerning the drug's commercialization. The husband, who was an anesthesiologist, assisted his wife with writing summaries of patient histories for participations in the clinical trials who experienced serious adverse events.

  After his wife returned from a meeting with the FDA regarding concerns over increased incidence of adverse events to patients in clinical trials, her husband sold all Ariad shares in his personal brokerage accounts. Then, after Ariad instituted a blackout of any trading of Ariad to employees and anyone living with employee, regardless of relation, the husband again traded his stock to avoid a significant loss. Finally, during the blackout period, the husband continued to both purchase and sell thousands of shares of Ariad stock, each time trading on the basis of confidential information to maximize his gains and minimize his losses. In addition, the husband tipped a friend and advised him to buy Ariad shares one week before the FDA gave approval for the drug to be marketed and sold. The husband then perjured himself when he testified before the SEC, falsely claiming that he did not rely on information from his wife before he traded in Ariad stock.

- ***United States v. Yan***, No. 17-MAG-5156 (S.D.N.Y. July 11, 2017): Wife worked at law firm that represented a mining company in negotiations to acquire Stillwater Mining

10

Company, a publicly traded company. Prior to the public announcement of a merger, her husband, who learned from his wife about the acquisition, used a brokerage account he set up in his mother's name to buy options of Stillwater Mining stock. The husband also conducted internet research including "how sec detect unusual trade", "insider trading with international account" and "want to commit insider trading? Here's how not to do it".

- **United States v. Bohra**, No. 2:20-cr-00165 (W.D. Wash.) Wife worked in finance department at Amazon. Her husband consulted with his wife regarding Amazon's financial outlook and, using confidential information, repeatedly traded Amazon stock and options in time periods preceding each of Amazon's public announcements of its earnings. Husband traded in accounts held in his name and in accounts of other immediate family members, including his father, mother, and sister. Husband repeatedly traded during Amazon blackout periods preceding each of Amazon's public announcements. The husband traded for a 2.5 year period in advance of 11 conservative quarterly earnings announcements. Husband invested in total of $17,606,062 in Amazon securities during length of the scheme and roughly one-quarter of these trades (nearly $5 million) were trades based on material, non-public information. In addition, the husband allegedly tipped his father.

- **SEC v. Grevas**, No. 1:21-cv-04390 (N.D. Ill. June 13, 2022): Defendant's husband was employed as the director of benefits at a pharmaceutical company. The husband learned through the course of his employment that his company was to acquire a publicly traded pharmaceutical company. Defendant learned about this acquisition from her husband and immediately began purchasing shares of the target company. Over the course of the next month, defendant used five separate brokerage accounts, including two of which her family members' accounts over which she had control, to purchase 30,800 shares of the target company in 145 separate transactions. The defendant told her husband about her stock purchases, and he told her that there was a blackout period, and she was not permitted to trade in the stock. Nevertheless, after the acquisition was announced and the stock price rose dramatically, the defendant sold all of her shares of stock.

These criminal cases involving spouses are notable because of the presence of aggravating facts not present here. Mr. Loudon made no sophisticated attempts to conceal his trades, unlike *Yan,* who used a brokerage account set up in his mother's name; *Grevas,* who used five different family member's accounts; and unlike *Bohra,* who used accounts of immediate family members. Unlike many of these criminal cases, here there was no further tipping to family or friends, no significant or sophisticated efforts at executing the trades, nor any steps to avoid detection. Indeed, rather than sophisticated planning, what is most striking about Mr. Loudon's conduct was the naivete with which it was carried out. Mr. Loudon made absolutely no attempt to hide his tracks or to take any steps to avoid detection. Instead, when told by his wife

that BP was conducting a routine review of trading activity, Mr. Loudon confessed to her in tears that he had traded stock based on information he had learned from her conversations. Since that time, Mr. Loudon has pled guilty pre-indictment to a criminal information and, once again, admitted his guilt.

**B.** A downward departure or a downward variance is warranted for USSG 5H1.6 (Family Responsibilities)

After determining the correct sentencing range, the Court is to consider the relevant policy statements from the Sentencing Commission "to determine whether the specific characteristics of the offender and/or the offense warrant a modification to the sentencing range . . . if the court finds it necessary to impose a sentence 'outside the guidelines framework,' the sentence is termed a 'variance.'" *United States v. Gooch,* No. 2:20cr155-MHT, 2022 WL 1747334, at *1 (M.D. Ala. May 31, 2022). *See also United States v. Fumo,* 655 F.3d 288, 317 (3d Cir. 2011) ([a] "'departure' diverges … from the originally calculated [sentencing] 'range for reasons contemplated by the Guidelines themselves.' In contrast, a 'variance' diverges … from the Guidelines, . . . [range] based on an exercise of the court's discretion under 3553(a))."

Although U.S.S.G. § 5H1.6 advises that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted[,]" the Commentary to this section indicates a departure may be warranted where

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.

U.S.S.G. § 5H1.6 Commentary, Application Note 1(B)(i) & (ii).

District courts "can justify consideration of family responsibilities, an aspect of the defendant's 'history and characteristics,' 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines. 'District courts now … have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed not ordinarily relevant, such as age, education and vocation skills, mental and emotional conditions, employment record and *family ties and responsibilities.'" United States v. Menyweather,* 431 F.3d 692, 700 (9th Cir. 2005) (emphasis in original).

Here, Mr. Loudon is the sole family member available to help care for his elderly mother who is suffering from dementia, a condition that can be expected to worsen in the future. Although Mr. Loudon lives out of state from his mother, he is responsible for organizing and supervising her care and hires and supervises her support structure. If Mr. Loudon were to be incarcerated for a significant period of time, this support structure would crumble, as there is no one to step into Mr. Loudon's role. For this reason, the defense respectfully request that the Court vary downwards from the Guidelines range of 24 – 30 months and, instead, impose a sentence of one year home confinement, to be followed by two years of supervised release. A downward variance of this amount would be consistent with variances granted in similar circumstances. *See, United States v. King*, 201 F. Supp. 3d 167, 171 (D.D.C. 2016) (downward variance from 10-16 months to three years' probation for defendant who had participated in tax fraud scheme where defendant was sole family member available to care for her seven-year old daughter); *United States v. Gooch,* 2022 WL 1747334 (defendant convicted of theft of government property and granted a downward variance from a

13

guidelines sentence of 12-18 months to a sentence of one day and three years' supervised release, where a "sentence of incarceration would cause a substantial, direct, and specific loss of essential caretaking to her family; that the loss of caretaking would substantially exceed the harm ordinarily incident to incarceration of a similarly situated defendant . . . and that, by substituting home detention for incarceration, the court could prevent the loss of caretaking."); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (defendant's guidelines sentence for distribution of ecstasy reduced from 37-46 months to a non-custodial sentence of three years' supervised release, including nine months of home confinement, where defendant was responsible for the care of her disabled father and siblings); *United States v. Baker*, 502 F.3d 465, 467-69 (6th Cir. 2007) (downward variance from 27-33 months to five years' probation for possession of unregistered firearm, based on defendant's remorse, lack of danger to his family or community, and his familial responsibilities for his son, for whom he was the primary care-giver).

Given Mr. Loudon's central role in the supervision of his mother's care and the lack of anyone else to take on this role if he were to be incarcerated, coupled with his remorse, early plea, and the lack of additional aggravating facts surrounding the offense, a downward variance and sentence of home confinement is sufficient to meet the sentencing goals of § 3553(a).

**1. The requested sentence would reflect the seriousness of the offense, promote respect for the law, and would provide just punishment for the offense (§ 3553(a)(2)(A).**

In determining the appropriate sentence, the Court should consider all of the circumstances of the offense, as well as the individual characteristics of Mr. Loudon. The requested sentence – one year of home confinement, two years supervised release, the forfeiture of gains from the illegal trades – would reflect the seriousness of the offense, promote respect for the law, and it would be just punishment. Any punishment contemplated has to account for all of the consequences that have resulted from Mr. Loudon's guilty plea. These ramifications are

impossible to overstate. The impact has been devastating and has impacted virtually all aspects of his life. Mr. Loudon, as a result of his conduct, has lost his wife, his job, and his home. As a result of media reports, Mr. Loudon has become widely known as someone who defrauded his wife and been convicted of a serious felony. As noted in ECF No. 18, Mr. Loudon has already forfeited to the government $1.76M, which is the amount he profited from his trades.

Mr. Loudon did not come from money or a well-cushioned upbringing. His parents divorced under the ugliest of circumstances when he was a young child. His visits with his father had to be supervised due to his father's illegal drug use and unsavory habits. It was only because of his intelligence and extraordinary work ethic that Mr. Loudon was able to succeed in school, obtain two advanced degrees, and find employment as an engineer. Until this offense, Mr. Loudon has never had even a brush with law enforcement. This conduct was an aberration from an otherwise exemplary life.

The offense itself was unsophisticated and had no chance of going undetected. Mr. Loudon obtained information he was not entitled to have from his wife and then traded on it. Any sophisticated trader would have known that trades made by family members of covered employees would be reviewed for suspicious activity. Mr. Loudon made no effort to cover his tracks, and he did not tip others so that they could use this insider information for their own trades and then "kick-back" to him, as insider traders often do. Instead, when Mr. Loudon learned from his wife that BP was asking routine questions about trading activities of family members of "covered employees", Mr. Loudon made a tearful confession to his wife. He then pled early, pre-indictment, to a criminal information.

All of these circumstances are indicative of someone for whom criminal conduct is truly aberrational. Nothing in Mr. Tyler's past, or in the manner in which he committed this offense,

suggest he has a criminal nature. Rather, he has, for more than 40 years, lived a law-abiding life and, in this instance, went badly astray. He has admitted his conduct and pled guilty. There is nothing about these facts that suggest a prison sentence is required to fashion a "just sentence" or promote respect for the law.

A just sentence in this case is one that takes into consideration *all* of the relevant facts surrounding the offense, and the life of Mr. Loudon up to the time of the offense, as well as the offense conduct itself. Such a sentence would also recognize that insider trading involving spouses frequently do not result in criminal prosecutions. A just sentence would recognize the still redeemable qualities in Mr. Loudon. A sentence of one year home confinement, followed by two years of supervised release, would be fair and just.

### 2. The requested sentence would provide adequate deterrence (§ 3553(a)(2)(B)).

The consequences of Mr. Loudon's decision to trade on his wife's insider information are now public and widely known. The media has reported widely on Mr. Loudon's plea.[3] Anyone considering similar conduct will be adequately deterred simply by knowing that Mr. Loudon's trades were discovered almost immediately, he was prosecuted and forced to plead guilty to a felony, had to pay back his ill-gotten gains, and that he lost his job and his marriage. Those consequences alone – even before the imposition of a sentence from this Court – would no doubt provide significant deterrence to others contemplating similar conduct. A sentence requiring a year of home confinement, to be followed by two more years of supervised release, is sufficient to deter anyone foolish enough consider this type of conduct.

---

[3] A Lexis-Nexis search indicates that there were approximately 95 stories published about Mr. Loudon's guilty plea.

      **3.**     **Mr. Loudon poses no danger to the community and is no threat to reoffend ((§ 3553(a)(2)(C)).**

With the exception of the present criminal proceeding, Mr. Loudon has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. There is, therefore, no realistic risk of recidivism. Thus, this factor does not support a custodial sentence, let alone one within the Guidelines range.

In addition, Mr. Loudon clearly poses no threat to society. There has never been a suggestion by anyone that Mr. Loudon could be violent.

      **4.**     **Mr. Loudon requires no correctional treatment (§ 3553(a)(2)(D)).**

Mr. Loudon does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

## VI.   CONCLUSION

Under 18 U.S.C. § 3553(a)(3), the Court must consider "the kinds of sentences available" when determining an appropriate sentence and the Court has complete discretion to impose a non-custodial sentence, such as probation or home detention. The Court also has discretion to impose conditions to such a sentence that are in the public interest.

The ramifications of Mr. Loudon's conduct, and subsequent guilty plea, are impossible to overstate. The impact has been devastating and has impacted virtually all aspects of his life. Mr. Loudon, as a result of his conduct, has lost his wife, his job, and his home. As a result of media reports, Mr. Loudon has become widely known as someone who defrauded his wife and been convicted of a serious felony.

17

Given the totality of Mr. Loudon's otherwise exemplary life,[4] his decision to plead guilty early, the lack of sophistication or other aggravating factors surrounding this offense, as well as the critical role Mr. Loudon plays in supervising the care of his mother, we respectfully request the Court to impose a sentence of one year of home confinement, to be followed by two years' supervised release. Such a sentence would satisfy the § 3553(a) factors and would be "not greater than necessary to accomplish the sentencing goals advanced in *id.* § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. at 89.

Dated:  May 14, 2024                              Respectfully submitted,

                                                 */s/ Peter Zeidenberg*
                                                 Peter Zeidenberg
                                                 Arent Fox LLP
                                                 1717 K Street, NW
                                                 Washington, DC 20006-5344
                                                 Phone: 202.857.6139
                                                 Fax: 202.857.6395
                                                 Email:  peter.zeidenberg@arentfox.com

---

[4] The letters of support, at Ex. A, further support the conclusion that Mr. Loudon is a person of good character whose conduct in this instance was a true aberration.

18

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of May, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


<u>/s/ Peter Zeidenberg</u>
Peter Zeidenberg, Esq.

19